[Civ. No. 30638.   Second Dist., Div. Four.   Aug. 25, 1967.]

SEA-LAND SERVICE, INC., Cross-complainant and Appellant, v. MATSON TERMINAL CO., Cross-defendant and Respondent.

Graham, James & Rolph and Don A. Proudfoot, Jr., for Cross-complainant and Appellant.

Spray, Gould & Bowers for Cross-defendant and Respondent.

FOX, J.*—Plaintiff, a longshoreman, was employed on February 6 to 10, inclusive, 1962, by respondent Matson Terminal Company (herein referred to as Matson) to assist in unloading the SS *Short Hills*, a vessel owned by appellant Sea-Land Service, Inc. (herein referred to as Sea-Land) in the Long Beach-Los Angeles Harbor. Upon reporting to the vessel for work on the evening of February 8, plaintiff was directed by the hatch boss, an employee of Matson, to discharge cargo in the No. 2 deep tanks. There were six men in this particular unit. The tanks are at the very bottom of the vessel and are reached by descending various ladders from the main deck of the vessel. Upon entering the inshore deep tank in the No. 2 hatch, plaintiff noticed a quantity of damp to wet chemicals on the deck from ruptured and torn bags. It had rained that day. He immediately noticed an unusual odor, and a burning sensation in his nostrils and chest and developed a cough which brought up phlegm. At this time, plaintiff and his work partner, a Mr. Mendez, sent for the hatch boss to call his attention to these conditions. The hatch boss appeared briefly in the deep tank and then departed to return a few minutes later accompanied by the ship boss and the night superintendent, both of whom were also employees of Matson. The ship boss and night superintendent looked around briefly, held a

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

conference, and then departed. Plaintiff asked one of these men whether it was safe to proceed with the work and was advised that there was nothing there that could harm him and to commence the discharge. Matson did not provide plaintiff with protective clothing on February 8, but he had his own gloves. Ventilation blowers (portable rigs for blowing air into portions of the vessel) were provided approximately an hour after plaintiff was required by Matson to commence work. After the blowers were placed in operation the odor and discomfort decreased but did not disappear. Plaintiff worked out the shift period and the next morning went home. When he awoke he observed a measle-like rash covering many areas of his body. He continued to have a cough similar to the one which commenced soon after his entry into the deep tank. The next day plaintiff worked on the same vessel but in a different area. On February 10 plaintiff returned to the No. 2 inshore deep tank and at this time was provided with protective clothing by Matson. Plaintiff's rash and cough continued and he sought treatment for these conditions and finally filed suit against Sea-Land, the vessel's owner, alleged a chronic bronchial condition, and a rash of three months duration resulting from exposure and inhalation of dust and/or fumes from the chemicals on board the ship. Plaintiff's physician, Dr. Merliss, testified that both plaintiff's chronic bronchial condition and his rash were a result of exposure to sodium dichromate, one of the chemicals on board the ship in the No. 2 inshore deep tank at the time in question. The cargo manifest possessed by Matson showed the cargoes in the No. 2 deep tank included sodium dichromate.

Sea-Land tendered defense of the above-mentioned action to Matson and upon rejection of the tender filed a cross-complaint for indemnity based upon Matson's breach of the implied warranty of workmanlike services arising out of the contract for stevedoring services between Sea-Land and Matson.

After a trial to a jury a verdict was rendered on the main action in favor of plaintiff and against Sea-Land in the sum of $5,000 plus costs, and in favor of Matson and against Sea-Land on the latter's cross-complaint. Judgment was accordingly entered on both verdicts. This appeal involves only the judgment in favor of Matson and against Sea-Land on the cross-complaint.

The cross-complaint of Sea-Land alleged there existed a

written contract prior to the date of plaintiff's injury between Sea-Land and Matson but no such contract was offered in evidence.[1] The answer of Matson to the cross-complaint in essence denied any breach of warranty of workmanlike service on its part.

In seeking a reversal Sea-Land argues that the court erred: (1) In giving improper instructions and refusing to give other instructions dealing with Sea-Land's duties to Matson; (2) In giving improper instructions relating to the effect of Sea-Land's conduct upon its right to indemnity from Matson, and (3) In failing to fully instruct on Matson's duties and obligations to Sea-Land and the effect of a breach of Matson's warranty of workmanlike service.

Since appellant's attack upon the judgment is basically that the trial court improperly and inadequately instructed the jury on certain aspects of the indemnity action, we shall quote the instructions actually given dealing with the shipowner's claim of indemnity against the stevedoring company. The record reveals that the court gave only two instructions on the indemnity action.[2]

---

[1]Much of respondent's brief is written on the assumption that there was a contract in writing between the owner of the vessel and the stevedoring company which defined their mutual rights, obligations and liabilities of indemnity. Absent such a written contract we must look to the relevant principles of maritime law as declared by the federal courts for an answer to the questions here presented and to ''Safety and Health Regulations for Longshoring'' promulgated by the United States Department of Labor under authority of 33 U.S.C.A. section 941.

[2]These two instructions read as follows:

''The second lawsuit involved in this case relates to the respective rights and obligations of the shipowner and the stevedoring company, in the event that you determine that plaintiff is entitled to recover damages from the shipowner.

''The contract between the shipowner and the stevedoring company requires the stevedoring company to do whatever is required to unload the ship in a workmanlike manner and with reasonable safety, and requires the shipowner to have the ship in a condition reasonably capable of being unloaded with safety. The shipowner and the stevedoring company are each required to perform their respective obligations under the contract.

''If the shipowner placed the ship in a condition reasonably capable of being unloaded with safety and the stevedoring company failed to do whatever was required to unload the ship in a workmanlike manner and with reasonable safety and by reason thereof plaintiff is entitled to recover damages from the shipowner, the stevedoring company will have broken its contract and must indemnify the shipowner for the full amount of such damages. In that event your verdict will be in favor of the shipowner and against the stevedoring company.

''On the other hand, if the shipowner failed to have the ship in a condition reasonably capable of being unloaded with safety and such was a proximate cause of plaintiff's injuries, the shipowner will have broken its contract and will not be entitled to indemnity from the stevedoring com-

Before critically reviewing the instructions we must examine the cases that have developed the principles that assist in answering the question: May a shipowner obtain indemnity for loss it sustains as a result of an injury to a longshoreman which is caused by the stevedoring company's failure to render a workmanlike service with reasonable safety? The landmark case on this question is *Ryan Stevedoring Co.* v. *Pan Atlantic S. S. Corp.*, 350 U.S. 124, 133 [100 L.Ed. 133, 141, 76 S.Ct. 232]. It held that the stevedoring agreement necessarily included the implied-in-fact obligation to load and discharge cargo "properly and safely." "Competency and safety," the court pointed out, "are inescapable elements of the service undertaken." Hence, this obligation "is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. It is of the essence of . . . [the] stevedoring contract." Thus, this implied-in-fact obligation on the part of the stevedoring contractor is to perform stevedoring services for the shipowner in a workmanlike manner and with reasonable safety. A breach of this obligation makes the stevedore liable to indemnify the shipowner. This doctrine was later qualified by *Weyerhaeuser S. S. Co.* v. *Nacirema Operating Co.*, 355 U.S. 563, 567 [ 2 L.Ed.2d 491, 494, 78 S.Ct. 438] in which the court indicated that recovery of indemnity by

pany. In that event your verdict will be in favor of the stevedoring company and against the shipowner.

"If the shipowner broke the contract by failing to have the ship in a condition reasonably capable of being unloaded with safety and the stevedoring company broke the contract by failing to do anything required to unload the ship in a workmanlike manner and with reasonable safety and plaintiff was injured as a proximate result of such joint violations of the contract by the shipowner and the stevedoring company, the shipowner is not entitled to indemnity from the stevedoring company. In that event your verdict will be in favor of the stevedoring company and against the shipowner.

"The shipowner has the burden of proving that the stevedoring company failed to do something required to unload the ship in a workmanlike manner or with reasonable safety and that such was a breach of the contract and was the proximate cause of plaintiff's injuries and damages. The stevedoring company has the burden of proving that the shipowner failed to have the ship in a condition reasonably capable of being unloaded with safety.

"When a stevedoring company holds itself out to be skilled, expert and experienced in its business, it is held to the standard of care of a professional, skilled and expert stevedoring company. This means that it is assumed to be experienced at unloading ordinary cargoes stowed in the customary manner, that it is aware of the dangers to life, limb and property with which it must contend, and that it knows how and has the ability to carry out its operation with *reasonable* safety under the circumstances."

the shipowner would not be allowed if there "was . . . conduct on its [the shipowner] part sufficient to preclude recovery."

The development and application of these principles are delineated by the later Judge Mathes (S.D. Cal.) in a scholarly opinion in *Hugev* v. *Dampskisaktiesclskabet International,* 170 F.Supp. 601, affd. on 274 F.2d 875.[3] The court noted the express words of the contract between the shipowner and the contracting stevedore did no more than obligate the latter to " 'perform all loading and discharging of all cargo.' " The court pointed out (p. 608) that: "The stevedoring company's implied-in-fact contractual obligation to perform its duties with reasonable safety embraces not only the handling of cargo but. . . . also the duty to suspend the loading or unloading operations on its own initiative, and thus to avoid injury or damage, whenever the stevedore realizes that it would be unsafe under the circumstances to proceed. [Citations.] So if the stevedoring contractor renders a substandard performance which foreseeingly leads to the shipowner's liability to a longshoreman, the shipowner would be 'entitled to indemnity absent conduct on its part sufficient to preclude recovery.' [Citation.]

"That is to say, if the stevedoring contractor commits a material breach of its contractual obligation to the shipowner and such breach is a proximate cause of damage to the shipowner, then the stevedoring contractor would be liable for breach of contract to the extent of such damage, unless the shipowner has been guilty of a material breach of the contract. [Citation.]"

The court pointed out that defendant shipowner (in *Hugev*) admitted owing an implied warranty of seaworthiness to plaintiff longshoreman, and a breach of warranty, and that such breach was one of the proximate causes of plaintiff's injuries. But the shipowner asserts that this unseaworthy condition did not constitute a breach of any obligation owed by the shipowner to the stevedoring contractor.

"The implied warranty of the shipowner as to seaworthiness," says the court (p. 609), "first raised by law in favor

[3]In affirming Judge Mathes' decision the court (per curiam) stated: "We are satisfied in this matter that the exhaustive opinion of the trial judge, supported by the subsequent majority opinion in *Crumady* v. *The Joachim Hendrick Fisser* (1959) 358 U.S. 423 [3 L.Ed.2d 413, 79 S.Ct. 445] . . . correctly decides the issues involved herein." (274 F.2d at p. 876.)

of the shipper of cargo [citation], later extended to seamen [citation], and still later to longshoremen [citation], does not extend to the stevedoring contractor. Those considerations of reason and policy which prompted extension of the benefit of the warranty to the individual longshoreman, *absent any contractual relationship,* do not exist with respect to his employer, the contracting stevedore."[4] (Italics added.)

The court noted (p. 609) that "the terms of the stevedoring contract [as in the case at bench so far as we are advised from the record] do not expressly impose upon the shipowner any material obligation beyond that of payment to cover the stevedoring service. . . ."

The court, however, did call attention to the long-standing principle that "the shipowner owes a duty of ordinary care imposed by law toward 'persons rightfully transacting business on ships. . . .' [Citations.]" (P. 610.)

The court then summarized (pp. 610-611) the implied-in-fact obligations the shipowner owes to the stevedoring contractor (where the contract expressly only imposes on the shipowner the duty to pay for the services rendered):

"The surrounding circumstances of fact, and that of law just recited, prompt the holding that, *absent express provision to the contrary,* the shipowner owes to the stevedoring contractor under the stevedoring contract the implied-in-fact obligations: (1) to exercise ordinary care under the circumstances to place the ship on which the stevedoring work is to be done, and the equipment and appliances aboard ship, in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care under the circumstances to load or discharge the cargo, as the case may be, in a workmanlike manner and with reasonable safety to persons and property; and (2) . . . [not here relevant]." (Italics added.)

Of course, cargo too may become unsafe or dangerous due to its character (as in the case of chemicals), the inadequacy of its containers, ineptness in its stowing, and the turbulence of the voyage although the ship and its crew have exercised ordinary care in all relevant respects. An experienced steve-

---

[4]The reasons for this rule are stated in detail in 170 F.Supp. at pp. 609-610.

doring contractor will be mindful of these and other dangers that he may reasonably expect to encounter, growing out of the hazards of the ship's business and will be able by the exercise of ordinary care to unload the cargo in a workman-like manner and with reasonable safety.

Measured by the principles stated and others that will be adverted to later, we are persuaded that the instructions were inaccurate and inadequate.

■ The basic difficulty with the instructions grows out of the assumption on the part of Matson that Sea-Land, the owner, expressly agreed to provide a ship and cargo in a certain condition for unloading. Matson states its position in this fashion: ''It is clear from the record that Sea-Land under-took expressly to furnish a ship reasonably capable of being unloaded with safety under its contract with Matson. It was not an implied provision.'' It was mentioned earlier that a written contract between Matson and the owner of the vessel was entered into, but it was also noted that the contract was not introduced in evidence. So there is no proof that ''Sea-Land undertook expressly to furnish a ship reasonably cap-able of being unloaded with safety under its contract with Matson.'' There was. therefore, no basis for the court to so instruct the jury, and it was error to do so for it placed upon the shipowner a burden and responsibility that was not estab-lished by the contract, and which it is conceded ''was not an implied provision.'' It placed upon the owner a greater responsibility than the law imposed upon it. This is in effect conceded by respondent in its brief, for it states: ''Its [appel-lant's] obligation, therefore, *was not* 'to exercise ordinary care' to have the ship reasonably capable of being unloaded with safety.'' (Italics in brief.) Yet, ''absent express provi-sion to the contrary'' in the contract, as pointed out in *Hu-gev* (p. 610), that is essentially the duty the shipowner owed to the stevedoring contractor. Thus, it is apparent that in erroneously placing this extra burden or duty upon the owner, its rights were substantially prejudiced.

■ We come now to the failure of the court to instruct on the duty of the stevedoring company upon receiving com-plaints from the longshoremen[5] assigned to No. 2 deep tank

[5]Mendez, for example, complained that ''there is something wrong down here; get some equipment or do something about it.'' Plaintiff testified that upon entering the deep tank the odor was ''very bad.'' He experienced a burning sensation. He observed ''broken bags and damaged cargo'' and spilled chemicals. He described the condition as ''quite

about conditions therein. The hatch boss responded to these complaints. He was sufficiently concerned that he brought the ship boss and the superintendent down into the deep tank. They held a brief conference. Plaintiff overheard the superintendent tell the ship boss to order blowers. It is thus clear that the stevedoring company knew there was difficulty in No. 2 deep tank, and could reasonably conclude in light of the complaints, the conditions the supervisory personnel observed, and the character of the cargo in the tank that the situation was unsafe and very likely dangerous. In face of such conditions the jury under proper instructions could reasonably have impliedly found that ordering the men to proceed with unloading the cargo was a breach of the stevedoring company's implied warranty of proper workmanlike service.

The law is clear that a stevedoring company should not proceed to unload a cargo in the face of known dangerous conditions. In such circumstances it is the obligation of the stevedore to either remedy the condition, or have the ship remedy it or, if necessary, stop the discharge of the cargo.

The principle is illustrated in *Pacific Far East Line* v. *California Stevedore & Ballast Co.* (N.D.Cal. 1965) 238 F.Supp. 956. In that case the stevedoring company came on board the vessel and noted almost immediately that some drums of oil, previously loaded by a different stevedoring company, were leaking on the deck but continued to work after notifying the ship of the condition. The result was an injury to a longshoreman who slipped in the oil. The court held that the stevedore had breached its warranty of workmanlike service. The court stated (pp. 958-959):

"The great weight of authority allows the shipowner to recover indemnity from a stevedore company which proceeds to work its crew under an unsafe, unseaworthy condition of which the stevedore company has knowledge. The reasoning is that such conduct of the stevedore company brings the unseaworthiness of the ship into play and amounts to breach of the stevedore's warranty of workmanlike service.

"        .        .        .        .        .        .        .        .        .        .        .        .

messy." The supervisory personnel who came down into No. 2 deep tank could observe these physical conditions. Also, the stevedoring company had a copy of the cargo manifest listing the cargo carried in the deep tank, and thus knew or had the opportunity of readily finding out that it was a chemical substance and might give off fumes that would be harmful or even dangerous.

"We are of the opinion that the majority rule is preferable because it furthers the primary consideration of avoidance of accidents. The possibility of indemnity over against it by the shipowner will cause a stevedore company to hesitate before risking its crew in an unsafe, unseaworthy condition—as it might do if it could do so with impunity. Presumably, a shipowner, even one whose ship in some respect subjects it to an absolute liability for unseaworthiness, would prefer that work be stopped rather than the condition be 'brought into play' by the stevedore company to the injury of a worker. The stevedore company's warranty of proper workmanship is broad enough to imply that it will not proceed in the face of a known, dangerous condition. Its clear obligation is to either remedy the condition, or have the ship remedy it or, if necessary, refuse to subject workers to the risk of injury—an obligation analogous to the obligation to exercise the 'last clear chance' as recognized by the law of torts."

In the case at bench there was clearly a factual issue for the jury under appropriate instructions, and appellant offered such instructions which should have been given.[6] We find no merit in respondent's criticism of these proposed instructions.

■ There was evidence from which the jury could have found that the stevedoring company did not provide proper appliances and protective equipment in violation both of its general duty to do so and the specific regulations for longshoring. In particular, the evidence indicates there were broken bags and spilled chemicals on the deck area which was "damp to wet." Yet, despite this "messy" condition, no protective clothing (plaintiff had his own gloves) was provided until the second day in violation of section 9.103(a), Safety and Health Regulations for Longshoring.[7] Also, ventilation blowers were

---

[6]The instructions offered by appellant and rejected read:

"A shipowner has a right of action against a stevedoring company when the latter's breach of its obligation to perform in a workmanlike manner results in liability of the ship to longshoremen. Once a stevedoring company has knowledge of an unsafe condition, there is an obligation upon the stevedoring company to remedy the condition or to cause the ship to do so. This obligation ordinarily includes the duty not to continue work until a known dangerous condition has been made reasonably safe."

"There is a definite duty on the part of the stevedoring company to call to the attention of ship's officers all unseaworthy conditions and to stop all operations when it appears that to proceed would be unsafe."

[7]Section 9.103(a) reads: "When employees are handling cargo which, due to rupture, leaking or inadequate containers, may cause burns, skin irritation or be otherwise injurious to health, they shall be protected by suitable protective clothing."

not provided for approximately an hour after plaintiff and his co-workers were ordered to proceed with the discharge of the cargo. In spite of this the court refused to instruct with respect to either (1) the general duty of the stevedoring company to supply necessary appliances or equipment for safely unloading the vessel or (2) the specific regulation contained in section 9.103(a).[8]

The court's error in refusing to give appellant's requested instruction is compounded by the fact the court did instruct at *plaintiff's* request that a violation of section 9.103(a) would be grounds for liability of the shipowner to *plaintiff*. This made it all the more important that the jury be instructed on the stevedore's duty to provide the proper and necessary equipment as part of its warranty of workmanlike service. The failure to give the requested instruction was prejudicial for it could well have led the jury to conclude there was no obligation on the part of the stevedore to provide such equipment and that, therefore, there was no breach of the implied warranty of workmanlike service on its part. The giving of this instruction on behalf of plaintiff, and not giving it in the indemnity aspect of the case, could well have led the jury to conclude that the responsibility for providing proper stevedoring equipment, as between the shipowner and the stevedore, was upon the shipowner and not the stevedore, a conclusion clearly contrary to the law.

The judgment in favor of Matson and against Sea-Land Service is reversed.

Files, P. J., and Jefferson, J., concurred.

---

[8]Appellant submitted an appropriate instruction based on section 9.103(a).